IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 115,628

In the Matter of the Estate of
ROXIE A. MOORE,

HARVEY L. MOORE,
*Appellant*,

v.

MAUREEN E. MILES, KENNETH L. KOLLENBACH,
BART A. MOORE, LAURIE MOORE, and RYAN C. MOORE,
*Appellees*.

SYLLABUS BY THE COURT

1.

An amanuensis is a person who takes dictation or who puts in writing what another person has dictated.

2.

An amanuensis is not, strictly speaking, an agent but acts as an extension of the principal.

3.

When an amanuensis renders a signature for a person, acting in the presence of such person and at such person's direction, the signature becomes the signature of the person for whom it is made, and it has the same validity as if it had been written by the person giving the direction.

1

4.

Sufficient parallels exist between the duty of an amanuensis to transcribe faithfully at the direction of another and the duty of an agent to act in good faith on behalf of a principal that the same burden of proof applies to establishing the authority of either an amanuensis or an agent.

5.

A party must prove by a preponderance of clear and convincing evidence that a writing was carried out by a party acting as an amanuensis.

6.

When reviewing a case subject to a preponderance of the evidence standard, the appellate court determines whether, without reweighing the evidence, the district court's judgment is supported by substantial evidence when viewed in the light most favorable to the party prevailing below.

7.

A court may properly consider evidence beyond the language of deeds and official signatures in ascertaining whether deeds have been effectively executed and acknowledged.

8.

Acknowledging officers and registers of deeds are ministerial officers who do not act in a judicial capacity, and any mistakes they make may be explained and corrected by proper proof.

9.

An acknowledgment is not a part of a contract between parties but is only prima facie evidence of the execution of a deed.

10.

The testimony of witnesses to the signing of a deed may render an improperly acknowledged deed valid.

11.

An instrument vesting title to property upon the death of the maker of the instrument is testamentary in character.

12.

When suspicious circumstances lead to questions of the validity of a testamentary document, courts are to apply a clear and convincing evidence test.

13.

Courts presume that every adult is fully competent to enter into a contract until satisfactory proof to the contrary is presented.

14.

Testamentary capacity requires a basic understanding of the property at issue and how the testator wishes to dispose of it.

15.

The burden is on a party contesting the presumptive validity of a testamentary document to prove lack of testamentary capacity through clear and convincing evidence.

Review of the judgment of the Court of Appeals in 53 Kan. App. 2d 667, 390 P.3d 551 (2017). Appeal from Cowley District Court; JAMES T. PRINGLE, judge. Opinion filed September 6, 2019. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Jason P. Brewer,* of Wilson & Brewer, P.A., of Arkansas City, argued the cause and was on the briefs for appellant.

*James D. Oliver*, of Foulston Siefkin LLP, of Overland Park, argued the cause, and *Sharon E. Rye*, of the same firm, of Wichita, was with him on the briefs for appellees.

The opinion of the court was delivered by

ROSEN, J.:  We are asked here to determine the validity of a transfer-on-death deed that was signed by a benefiting party at the direction of the party seeking to make the transfer. The district court upheld the validity of the deed, the Court of Appeals affirmed, and this court granted review. We affirm.

FACTS

Roxie Moore was born on August 14, 1909. She married Harvey Moore Sr. and the two had one child, Harvey Jr. (Harvey). At one time they owned close to 900 acres of land in different parts of Kansas. Central to their holdings were 360 acres located north and west of Cambridge, Kansas, not far from the town of Burden. Roxie referred to this land, where the principal residence lay, as the "homeplace."

In 1969, Harvey married Maureen Miles, and they had two sons, Bart and Ryan. In the early 1980s, Roxie and Harvey Sr. moved from the homeplace to Burden in order to be closer to Bart and Ryan. In 1985, Harvey Sr. died. Roxie continued to live in Burden,

4

where she had a stroke on August 2, 1991. The stroke significantly impaired her speech, but she continued to live in her home.

From the 1970s to the end of the 1990s, Harvey engaged in various business enterprises that did not pan out. To support him, Roxie provided 440 acres of land she owned east of Cambridge as security, all of which was lost due to foreclosure around 1995. Roxie also lent Harvey about $80,000, none of which he paid back. During that time, Harvey also overdrew from Roxie's bank account, on which he was a joint account holder, for his own benefit, and he took some $30,000 in certificates of deposit from her safe for his own use, despite her objections.

In December 1992, Harvey and Maureen ended their marriage. After the divorce, Harvey and his girlfriend moved in with Roxie. Roxie continued to have a close relationship with Maureen, however, who would drive her on errands, visit to talk, and attend to her medical care. In 1998, Roxie opened a new banking account that did not allow Harvey to have access to the funds. Harvey nevertheless continued to take checks made out to Roxie and convert them to his own use. These included annuity checks, social security checks, and payments from leases on Roxie's remaining property.

In August 2003, Roxie fell while in her home in Burden. She broke her hip and was unable to return to her house. She entered an assisted living facility in Winfield. There were some signs that she was beginning to experience dementia, although people reported that she remained alert, knew who family members and friends were, and was able to carry on conversations with people whom she trusted for years afterwards. Maureen saw to the financial arrangements for Roxie's assisted living, which ultimately amount to approximately $265,000.

On April 29, 2004, Roxie executed a durable power of attorney naming Maureen as her attorney-in-fact. At around the same time, Roxie asked Maureen to procure the services of attorney David Andreas to protect the remaining homeplace property from Harvey so that Bart and Ryan could someday take ownership of it. Andreas drafted a transfer-on-death deed assigning the homeplace property to Maureen on Roxie's death.

On May 10, 2004, Stephanie Nulick, a secretary and notary public with Andreas' law office, went to the nursing home where Roxie was living. Roxie was lying in bed. In the presence of Nulick and five other people, Roxie read the transfer-on-death deed; it was also read to her. She checked to make sure that the property description was correct. Ryan asked her if she was sure she wanted to give him and his brother the property on her death, and she said she was. She said that she was in too much pain to sit up and sign the document, and she asked Maureen to sign for her, saying, "Maureen, I want you to sign it." Maureen asked if she was certain that she wanted the document signed in that fashion, and Roxie said yes. Maureen then signed Roxie's name, adding a notation that she was signing as a power of attorney.

Roxie died on September 15, 2009. On November 7, 2012, Maureen and her husband executed a warranty deed conveying the homeplace property to Bart and Ryan.

On June 11, 2014, Harvey filed a petition for determination of descent asserting that Roxie's estate consisted of the real estate in Cowley County. Bart and Ryan filed a response asserting that the property had passed to them under the transfer-on-death deed and therefore was not part of Roxie's estate. In January 2015, Harvey filed a motion for summary judgment. Respondents Maureen; her husband, Kenneth Kollenbach; Bart; his wife, Laurie Moore; and Ryan filed a response and a counter motion for summary judgment.

6

The district court initially ruled in Harvey's favor, granting him summary judgment and title to the property. This decision was based on the conclusion that an attorney-in-fact may not use the power of attorney to benefit herself. The respondents filed a motion to reconsider, arguing that Maureen signed the deed not in her capacity as attorney-in-fact, but as a mere amanuensis—one whose agency relationship with a principal is limited to accurately transcribing words or signatures at the direction of the principal.

The district court granted the respondents' motion on the amanuensis theory and set the matter for trial. Following a full evidentiary hearing, the court granted judgment in favor of the respondents. The Court of Appeals affirmed the district court in *In re Estate of Moore*, 53 Kan. App. 2d 667, 390 P.3d 551 (2017). This court granted review.

ANALYSIS

The district court deemed the transfer-on-death deed to constitute an enforceable transfer of Roxie's real property to Maureen. Harvey challenges various determinations that the district court made in reaching its judgment. In particular, he urges this court to reject the theory that an amanuensis may sign a transfer-on-death deed on behalf of the property owner; he asks this court to hold that the deed was invalid because it was improperly acknowledged; he challenges the burden of proof applied to overcoming a presumption of undue influence; and he argues that the district court placed the incorrect burden on him to show that Roxie lacked testamentary capacity. We will consider each of these issues in turn.

*Validity of Signature by Amanuensis*

Maureen signed Roxie's name on the transfer-on-death deed and then added: "by Maureen Miles, Power of Atty." In the district court, as well as in the appellate courts, the respondents did not assert that the power-of-attorney designation validated the deed. Instead, they maintained that Maureen acted purely as an amanuensis, and the power-of-attorney wording was nothing more than surplusage. We therefore will not address whether Maureen could lawfully have signed in her capacity as an attorney-in-fact and will instead consider whether she functioned as an effective amanuensis.

An amanuensis is one who takes dictation or who writes down what another has dictated. See Black's Law Dictionary 99 (11th ed. 2019). "'Where a person's name is signed for him at his direction and in his presence by another, the signature becomes his own, and is sufficient to give the same validity to an instrument as though written by the person himself.'" *Gaspard v. Iberia Bank*, 953 So. 2d 997, 999 (La. Ct. App. 2007). This "amanuensis rule" is "so uniformly recognized" that the Nevada Supreme Court, in upholding the validity of a land conveyance executed by an amanuensis, saw no purpose in citing the treatises and "hundreds of cases" supporting its application. *Lukey v. Smith*, 77 Nev. 402, 405-06, 365 P.2d 487 (1961).

The practice of using amanuenses has a rich history in Kansas. In *Stanhope v. Rural High-school District*, 110 Kan. 739, 742, 205 P. 648 (1922), for example, this court held that, when a signature is made for a person by the hand of another, acting in the presence of such person and at such person's direction, the signature becomes the signature of the person for whom it is made, and it has the same validity as if it had been written by the person giving the direction. See *State v. Uhls*, 121 Kan. 587, 589, 249 P. 597 (1926) (crediting the testimony of the defendant's amanuensis); *Filley v. Insurance Co.*, 93 Kan. 193, 205, 144 P. 257 (1914); *Insurance Co. v. Bank*, 60 Kan. 630, 637, 57 P.

8

524 (1899) (insurance agent acted as valid amanuensis for purchaser in writing down answers to questions on application form); *Treadway v. Ryan and others*, 3 Kan. 437, 444 (1866).

In *Schnee v. Schnee*, 61 Kan. 643, 648-49, 60 P. 738 (1900), a witness was unable to write so he asked another person to sign his name. In upholding the validity of the will, this court noted that little importance should be given to the physical act of signing:

> "Some of the courts have given what we deem to be undue importance to the physical participation in the act of signing, and have ruled that witnesses must do some manual act towards making the signature. The more satisfactory authorities, as well as reasons, sustain the view that the name of an attesting witness who is unable to write may be written by another at his request, in his presence and in the presence of the testator. As stated in *Lord v. Lord*, 58 N.H. 7 [(1876)], 'to require a person, whose name is to be written in a testamentary transaction, to hold or to touch the pen, or to do anything which the law does not require him to do in other cases of attestation, seems to establish a distinction without a difference.' [Citations omitted.]"

K.S.A. 59-3501 sets out the procedure for creating and validating a transfer-on-death deed, including a requirement of a signature by the owner of the interest. To be sure, K.S.A. 59-3501(a) does not expressly allow signature by another, but this does not defeat permitting a directed signature by an amanuensis. As Bogert's Trusts and Trustees § 86 (2d. ed. rev. 1984) notes, the one who has the power to make the writing which renders the instrument enforceable will usually sign or subscribe himself,

> "but this is not necessary. He may permit another in his presence to sign . . . thus allowing the other to act as an amanuensis, and this will be sufficient. Many statutes also provide for the signing by an agent, and, *even where this is not expressly stipulated, it is doubtless proper* if the agent is in fact authorized to perform this act. . . . The signature of the agent alone will satisfy the Statute." (Emphasis added.)

9

K.S.A. 59-3501(a) states that a transfer-on-death interest may effectively be created "by recording a deed signed by the record owner of such interest . . . ." We do not read this statutory language to remove the capacity of a property owner to sign away the interest through an agent or amanuensis. K.S.A. 58-2209 states that "[*a*]*ll deeds . . .* shall be subscribed by the party granting the same, *or by the party's lawful agent or attorney . . . .*" (Emphases added.) The phrase "all deeds" certainly includes transfer-on-death deeds, and we will not give a contradictory construction to the transfer-on-death statute, in light of the extensive and long history of treating a signature by an amanuensis as legally equivalent to a signature by the party directing that the signature be rendered.

Furthermore, the power-of-attorney statute explicitly permits an agent to designate beneficiaries who will receive property on the principal's death. K.S.A. 2018 Supp. 58-654(f)(6). The Legislature has thus expressed a clear intention that transfer-on-death deeds may be signed by parties who are not the actual property owners. This intention is consistent with the law relating to signatures for other forms of property conveyances. Our understanding of the legislative intention is consistent with the long and widely held law of amanuensis:  that the party acting as the amanuensis signs with the same authority and legal effect as if the signature were physically provided by the principal directing the signature.

Corpus Juris Secundum summarizes the general rule:

> "The 'amanuensis rule' provides that where the signing of a grantor's name to a deed is done with the grantor's express authority, the person signing the grantor's name is not deemed an agent but is instead regarded as a mere instrument or amanuensis of the grantor, and that the signature is deemed to be that of the grantor." 26A C.J.S., Deeds § 64, n.1.

10

Harvey urges this court to reject the amanuensis rule because it undermines certainty in ascertaining the intent of parties to contracts and conveyances, which, he contends, is bad public policy.

Harvey essentially urges this court to reverse 150 years of its own common law and also to make Kansas, as best as can be determined, the only American jurisdiction that does not recognize the authority of amanuenses to sign contracts and deeds. The doctrine of stare decisis itself is grounded in public policy; it helps parties understand what their rights and obligations are. See *State, ex rel., v. Fadely*, 180 Kan. 652, 669, 308 P.2d 537 (1957). It is unknown how many contracts and conveyances are outstanding that would be rendered void by a reversal of precedent by the court in this case. We see no reason to depart from this widely recognized doctrine of law.

As the respondents note, to hold otherwise would deprive a person of the ability to convey property if the person were illiterate or physically unable to sign a deed. We will not now interpret the Kansas statutory scheme to take away from mature, informed, and understanding individuals the capacity to dispose of their property based on physical ailments or pain. The evidence in the present case shows that Roxie was in great pain, and she stated that she would be unable to sign the deed personally without putting herself through additional discomfort. Harvey argues that Roxie was not physically "unable" to sign the deed but merely avoided doing so in order to avoid pain. Aside from creating a previously nonexistent legal obligation—that a conveyor of property must be able to withstand excruciating pain—the argument is irrelevant. The widely cited common law on amanuensis requires only direction and understanding on the part of the principal; it does not require inability to sign.

The district court, in its proper capacity as fact-finder, determined that the evidence showed that Maureen acted as an amanuensis when she signed Roxie's name to

11

the deed. This finding implicitly meant that Maureen did not exercise independent judgment in rendering Roxie's signature and, in the words of the district court, the signing was "a mechanical act." The district court held that this finding was supported by a preponderance of the evidence.

The preponderance of the evidence standard is presumed applicable in civil actions between private litigants unless particularly important individual interests or rights are at stake. *In re B.D.-Y.*, 286 Kan. 686, 691, 187 P.3d 594 (2008). This standard is applied when a court is asked to determine whether an agency relationship exists when the court must resolve conflicting evidence. *Barbara Oil Co. v. Kansas Gas Supply Corp.*, 250 Kan. 438, 448, 827 P.2d 24 (1992). An amanuensis is not, strictly speaking, an agent but acts as an extension of the principal. See 12 Williston on Contracts § 35:4 (4th ed. 2012). Even so, we see sufficient parallels between the duty of an amanuensis to transcribe faithfully at the direction of another and the duty of an agent to act in good faith on behalf of a principal that we will apply the same evidentiary standards to both.

A preponderance of the evidence is "'evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it.' Black's Law Dictionary 1182 (6th ed. 1990). In other words, a 'preponderance of the evidence' means that evidence which shows a fact is more probably true than not true." *Ortega v. IBP, Inc.*, 255 Kan. 513, 527-28, 874 P.2d 1188 (1994).

While requiring no more than a preponderance of evidence, agency law requires proof of a valid principal-agent relationship through clear and convincing evidence. See *Barbara Oil*, 250 Kan. at 447-48 (proof must be by clear and satisfactory evidence); see also *Becker v. Knoll*, 301 Kan. 274, 276, 343 P.3d 69 (2015) (clear and convincing evidence is equivalent to clear and satisfactory evidence and shows truth of asserted facts is highly probable). Applying agency law burdens in the amanuensis context, we hold

that acting as an amanuensis requires proof by clear and convincing evidence. This is appropriate because an amanuensis can act to bind another party to contracts and transfers of property interests, much as an agent can.

When reviewing a case subject to a preponderance of the evidence standard, the appellate court determines whether the district court's judgment is supported by substantial evidence when viewed in the light most favorable to the party prevailing below. If substantial evidence supports the district court's factual findings, the appellate court does not reweigh the evidence. See *Golden Rule Ins. Co. v. Tomlinson*, 300 Kan. 944, 954, 335 P.3d 1178 (2014) (province of appellate court is to determine whether record reveals evidence on which finding of agency could be based); *Barbara Oil*, 250 Kan. at 448 (reviewing court considers only evidence of successful party to determine whether it is substantial, clear, and convincing); *Hughes v. Inland Container Corp.*, 247 Kan. 407, 410, 799 P.2d 1011 (1990).

In this case, the signing was witnessed by six people. Witnesses who were present testified that Roxie twice told Maureen to sign the deed. Significantly, Harvey offered no evidence controverting the testimony that Maureen executed the signature at Roxie's specific direction. The evidence supporting the amanuensis theory was clear, convincing, and uncontroverted. We therefore have no difficulty in affirming the district court's finding that Maureen signed the deed as an amanuensis.

*Evidence That the Deed Was Improperly Acknowledged*

The analysis must not end here, however. After signing Roxie's name to the deed, Maureen added an explanation that it was she who actually signed the document and that she had a power of attorney. When certifying the acknowledgement of the deed, the notary added a notation indicating it was Roxie's transfer-on-death deed, signed by

Maureen as her attorney-in-fact. Three days later, the County Clerk entered the deed in her transfer records.

The deed therefore generally conformed with the requirements of K.S.A. 59-3501 and K.S.A. 59-3502: it was signed, it designated a beneficiary, it was acknowledged by a notary, and it was recorded in the office of the register of deeds prior to Roxie's death.

Here, the acknowledgement, although arguably facially valid, was inconsistent with the circumstances under which the deed was signed and notarized. Harvey contends it was improper for the district court to consider parol evidence to show that the notary's acknowledgement certificate contained a judicially correctable error when it referred to Maureen as acting under a power of attorney. We disagree.

A court may properly consider evidence beyond the language of deeds and official signatures in ascertaining whether deeds have been effectively executed and acknowledged. In *Heil v. Redden*, 45 Kan. 562, 565, 26 P. 2 (1891), this court held:

> "[T]he grantee, or any person holding under him, would not be bound by the errors of a register of deeds in transcribing an instrument, and such errors might be explained. Acknowledging officers and registers of deeds are ministerial officers; neither act in a judicial capacity; any and all mistakes made by them may be explained and corrected by proper proof, as readily as mistakes of any other ministerial officers. [Citations omitted.]"

An acknowledgment is not a part of a contract between parties; it "is only *prima facie* evidence of the execution of the deed. If mistakes are made by the officer in taking an acknowledgment they are open to explanation and correction. [Citations omitted.]" *Mathewson, Administrator, v. Richards*, 114 Kan. 500, 503, 220 P. 185 (1923).

14

The execution of a will may be proved through testimony, and, if it is so proved, it is immaterial whether the deed was acknowledged or not. *Heaton v. Bank*, 59 Kan. 281, 289, 52 P. 876 (1898). The testimony of witnesses to the signing of a deed may render an improperly acknowledged deed valid. *Tawney v. Blankenship*, 150 Kan. 41, 47, 90 P.2d 1111 (1939). Even a completely unacknowledged signed deed conveys the property described as against the grantor and those claiming under the grantor. *Bryant v. Fordyce*, 147 Kan. 586, 589, 78 P.2d 32 (1938); see *In re Adoption of X.J.A.*, 284 Kan. 853, 873, 166 P.3d 396 (2007) (acknowledgment serves as prima facie proof of validity of a transfer of rights but is not essential; other evidence may be introduced to supplement or correct improperly acknowledged instrument).

We therefore conclude that the district court appropriately considered evidence relating to the authority by which Maureen signed the deed, notwithstanding the notary's designation of signature through power of attorney. We further conclude that the district court's determination that Maureen signed the deed as an amanuensis was supported by clear and convincing evidence.

*The Standard for Overcoming the Presumption of Undue Influence*

Even though Maureen signed the deed at Roxie's explicit direction, Harvey raises the real concern that the transfer was the product of undue influence because Maureen essentially signed a deed transferring property to herself.

Although such practice invites scrutiny, the law does not forbid a party from benefiting from a conveyance that the party helped to craft. For example, a party is permitted both to prepare a will and to be the primary beneficiary. K.S.A. 59-605(b) allows the preparer of a will to be a significant beneficiary if it is shown that the testator read or knew the contents of the will and had independent legal advice regarding the

15

contents of the will. Thus, under K.S.A. 59-605(b), one could draft the will for another person leaving the bulk of the estate to the drafter, and the same drafter could sign for the testator under K.S.A. 59-606, so long as the testator understood the contents of the will and received independent legal advice.

There is no reason to treat a transfer-on-death deed differently. An instrument vesting title to property upon the death of the maker of the instrument is testamentary in character. See *Truax v. Southwestern College*, 214 Kan. 873, 879, 522 P.2d 412 (1974). "It makes sense to treat all donative transfers alike to avoid the incongruous result of upholding a will made by a decedent under the lax standards for testamentary capacity, while setting aside a deed executed at the same time under the more stringent standards for lifetime contracts." Ross & Reed, Will Contests § 9:4 (2d ed. 2019).

In the present case, Maureen did not write or prepare the transfer-on-death deed. Roxie read and knew the contents of the deed, and it was she who had requested that her attorney draw it up. Maureen merely signed the deed in a scribe-like fashion.

Courts recognize, however, the danger that a self-interested amanuensis presents: it may be that it is the amanuensis who is directing the proceedings, not the donor. For this reason, courts have required the beneficiary in such a proceeding to prove a lack of undue influence, just as self-interested beneficiaries must do in related proceedings. See, e.g., *Cresto v. Cresto*, 302 Kan. 820, 833-34, 358 P.3d 831 (2015) (where suspicious circumstances exist regarding execution of testamentary documents, rebuttable presumption of undue influence is created); see also *In re Estate of Farr*, 274 Kan. 51, 71, 49 P.3d 415 (2002); *In re Estate of Haneberg*, 270 Kan. 365, 375, 14 P.3d 1088 (2000); *In re Estate of Brown*, 230 Kan. 726, 732, 640 P.2d 1250 (1982).

Other courts have addressed situations much like that of the present case. In *Estate of Stephens*, 28 Cal. 4th 665, 122 Cal. Rptr. 2d 358, 49 P.3d 1093 (2002), a daughter held a power of attorney for her blind father, for whom she cared for and who was dependent on her. The father had a deed drafted to convey real property to the daughter, and he instructed the daughter to sign his name on the deed. Because the daughter had an interest in the transfer and had no express written authority to self-deal, the court held that "the signing of a grantor's name by an interested amanuensis must be presumed invalid." 28 Cal. 4th at 677-78. To rebut the presumption, the interested amanuensis had "to show that his or her signing of the grantor's name was a mechanical act in that the grantor intended to sign the document using the instrumentality of the amanuensis." 28 Cal. 4th at 678. In *Estate of Bronson*, 892 N.W.2d 604, 608-609 (S.D. 2017), the South Dakota Supreme Court adopted the *Stephens* approach.

The *Stephens* court elected to impose a preponderance of the evidence standard on the rebuttal of an undue influence claim. 28 Cal. 4th at 677. A dissent, however, contended that this standard is too lax and allows too much room for dishonest practices. 28 Cal. 4th at 681 (Kennard, J., dissenting). We recognize the concerns of the dissent, concerns also addressed by Judge G. Gordon Atcheson in his concurring opinion in this case below. *In re Estate of Moore*, 53 Kan. App. 2d at 692-93.

This court has applied a clear and convincing evidence test in testamentary cases where suspicious circumstances have led to questions of testamentary document validity. See *Cresto*, 302 Kan. at 831; *In re Estate of Wallace*, 158 Kan. 633, Syl. ¶ 4, 149 P.2d 595 (1944). Rather than establishing an absolute bar against an amanuensis providing the signature necessary to transfer an interest to the amanuensis, we elect to impose on the benefiting party a standard of rebutting the presumption of undue influence by clear and convincing evidence.

17

This court recently explained the rules and standards for evaluating claims of undue influence. In *Cresto*, 302 Kan. at 832-33, the court explained:

> "This court has defined undue influence as '"such coercion, compulsion or constraint that the testator's free agency is destroyed, and by overcoming his power of resistance, the testator is obliged to adopt the will of another rather than exercise his own."' In other words, the testator becomes 'the tutored instrument of a dominating mind, which dictates to him what he shall do, compels him to adopt its will instead of exercising his own, and by overcoming his power of resistance impels him to do what he would not have done had he been free from its control.'

> "On the other hand, not all influence is improper. For example, influence obtained by kindness and affection will not be regarded as undue. . . .

> "Moreover, human desire, motive, and an opportunity to exercise influence will not, standing alone, sanction the inference that undue influence was, in fact, exercised. Instead, '"there must be evidence that [the person accused of undue influence] did exert it and did so control the actions of the testator that the instrument is not really the will of the testator."' [Citations omitted.]"

Beyond the presumption of undue influence, Harvey produced no independent evidence tending to show that Maureen exercised "such coercion, compulsion or constraint" that Roxie's free agency was destroyed, or that Roxie became "the tutored instrument of a dominating mind" that compelled her to adopt Maureen's will instead of exercising her own. An examination of the record and the factual findings of the district court instead tend to show multiple reasons why Roxie would freely elect to leave her property to Maureen instead of to her own son. We briefly recite the nature of this evidence here, not for the purpose of establishing that Maureen deserved the property for equitable reasons, but instead to show that clear and convincing evidence was present rebutting the presumption of undue influence.

18

Harvey exhibited remarkable financial irresponsibility between 1970 and 2000, which resulted in the loss of the majority of Roxie's land holdings. She lent Harvey approximately $80,000, none of which he repaid. She allowed Harvey to use approximately 440 acres of her land as security for loans that Harvey took out, all of which was lost due to foreclosure by the mid 1990s.

In 1992, after Roxie had suffered a stroke, Harvey visited Roxie at her home, took a key from the kitchen, and opened a safe where Roxie kept her certificates of deposit. Harvey admitted that Roxie told him not to take the certificates, but he took around $30,000 worth anyway, including one marked "to be used for funeral expenses." When Roxie attempted to take the certificates back from him, Harvey pushed her away. He then went to a bank and used the certificates to open an account in his own name.

Harvey lived for a time with Roxie, and, during this time, he was on Roxie's checking account. He overdrew the account several times. He admitted that he also helped himself to Roxie's annuity and social security checks and deposited them in his own account or cashed them. He also took checks that had been sent to Roxie for a gas well in western Kansas and for lease arrangements with her land. Roxie told Bart and Ryan that she would not let Harvey have the homeplace because he would lose it to creditors and because he had stolen other money from her.

In 1998, Roxie revoked any power of attorney authority that Harvey had and changed her bank account to remove Harvey from the account. Harvey admitted that he nevertheless continued to help himself to checks sent to Roxie for leases and gas rights. In the early 2000s, Roxie told a visitor, Deborah Keely, that she wanted the homeplace to go to Bart and Ryan because of Harvey's malfeasance, and she asked Keely to get her mail and hide it so that Harvey would not be able to find it. In 2003, Roxie told her great

19

niece that she was angry with Harvey, saying, "He's taken about everything else. He's not getting that farm ground—the homeplace."

Roxie fell at her home in Burden in 2003, breaking her hip, which required that she move into assisted living. Her care there cost approximately $265,000 over the next six years until her death. Harvey paid nothing toward her care and never visited her there. Maureen routinely visited her several times a week. In 2004, about 80 acres of Roxie's property in western Kansas were sold to pay for the assisted living care. Then, in 2005, Roxie's home in Burden was sold to pay for her care. In 2008, Maureen took out a line of credit of $100,000 on the homeplace property to pay for the care. At the time of Roxie's death, $50,000 of the credit had been used. In 2011, Maureen and her husband paid off the remaining debt so that the homeplace would be free and clear when it was transferred to Bart and Ryan.

In 2004, Roxie asked Maureen to procure papers that would ensure that Harvey did not gain possession of the homeplace property. Attorney David Andreas drafted a transfer-on-death deed assigning the property rights to Maureen upon Roxie's death. On May 10, 2004, Stephanie Nulick, a secretary and notary public from the Andreas office, went to the care facility to witness the signing. Present were Nulick, Maureen, Mildred Moore, Deborah Keely, Bart, and Ryan. Roxie read the deed herself, and it was read out loud to her. Ryan asked if Roxie was sure it was what she wanted to do, and Roxie said yes. Keely testified that Roxie told Maureen that she was suffering a great deal of pain and she asked Maureen to sign the deed for her.

The circumstantial evidence is clear and convincing that Roxie, for reasons of her own and not to please Maureen, had strong motivation to ensure that Harvey would not gain title to the homeplace property. Although Maureen clearly would benefit by obtaining ownership of that property, she surrendered her entire personal interest by

20

conveying the land to her sons before this litigation began. The facts, as the district court found them, rebut the presumption of invalidity of the deed under the clear and convincing evidence standard, and there is no need to remand this case to the district court to apply its factual findings to the heightened standard that we now adopt.

Separate from, but related to, the issue of undue influence is the question of Roxie's mental capacity to transfer her property. Courts presume that every adult is fully competent to enter into a contract until satisfactory proof to the contrary is presented. See *In re Estate of Hendrickson*, 248 Kan. 72, 77, 805 P.2d 20 (1991). Harvey was therefore required to rebut the presumption that Roxie was competent to convey a property interest to Maureen.

*The Standard for Proving Testamentary Incompetence*

The district court applied a testamentary level of capacity test to evaluate whether Roxie was competent to convey her property interests. Harvey contends that the district court should have required a more stringent definition of mental capacity—the ability to formulate and carry out complex contractual terms—for Roxie to have mental capacity to execute a valid transfer-on-death deed.

Testamentary capacity requires a basic understanding of the property at issue and how the testator wishes to dispose of it:

> "The test of a testamentary capacity is not whether a person has capacity to enter into a complex contract or to engage in intricate business transactions nor is absolute soundness of mind the real test of such capacity. The established rule is that one who is able to understand what property he has, how he wants it to go at his death and who are the natural objects of his bounty is competent to make a will even though he may be

feeble in mind and decrepit in body." *In re Estate of Perkins*, 210 Kan. 619, 626, 504 P.2d 564 (1972).

In *Cole v. Drum*, 109 Kan. 148, 159, 197 P. 1105 (1921), this court described the capacity necessary to dispose of property, either by a will or a deed:

"The rule is well established in this state that one who is able to understand what property he has, and how he wants it to go at his death, is competent to make a will even though he may be feeble in mind and decrepit in body. The value of property consists largely in the right to dispose of it as the owner desires, and this power of disposal, *either by deed or by will*, is not to be interfered with so long as the mental capacity indicated remains. This rule is found clearly set forth in numerous decisions of ours." (Emphasis added.)

There is no compelling reason why a simple awareness and understanding standard should apply to a conveyance after death made through a will but not to a conveyance made through a transfer-on-death deed. Roxie knew the identities of the people involved in the transaction and understood their relationship to her. She may not have understood the subtleties of property law, but she clearly did not want Harvey to come into possession of the property and she clearly wanted the property to stay in the family. Such understanding was sufficient to create a valid, legal transfer of property to Maureen upon her death.

Harvey also argues that the district court improperly applied a heightened burden of proof on him by requiring him to demonstrate Roxie's mental incompetence under a clear and convincing evidence standard instead of a simple preponderance of the evidence standard. He cites to a 1911 case, *Fish v. Poorman*, 85 Kan. 237, 244-45, 116 P. 898 (1911), which stated that a party might rebut a presumption of competence through a preponderance of the evidence.

22

The current state of the law, however, is that the same standard—clear and convincing evidence—applies for wills, contracts, and deeds. See *Cresto,* 302 Kan. 820, Syl. ¶ 1 (burden on party contesting presumptive validity of testamentary document is proof by clear and convincing evidence); see also *Union National Bank of Wichita v. Mayberry*, 216 Kan. 757, 762, 533 P.2d 1303 (1975).

In either event, it is difficult to conclude that Harvey presented even a preponderance of evidence demonstrating that Roxie lacked the capacity to make a knowing and understanding conveyance. Years after she signed the deed, she was observed at social events, recognizing and talking with social acquaintances and remembering the names of their children and facts about their lives. She requested that her attorney draw up a deed that would eventually convey her property to Maureen, she knew who Maureen was on the day of the signing, she checked the deed to make sure that it contained certain property, and she told her grandchildren that she wanted them to have the property. Even if a doctor evaluated her as having advanced dementia and found that she would not speak with him, ample other evidence showed a considerable degree of mental acuity. It is perhaps telling that, according to Harvey's testimony, his mother lost her competence to make financial decisions beginning in 1991 with her stroke, yet he expressly testified that she possessed the mental competence to give him permission to write checks off of her checking account. Harvey failed to overcome that evidence even under the laxer preponderance of the evidence standard.

Harvey raises two additional issues: that the deed was executed without complying with the Kansas Power of Attorney Act, and that the deed did not create a trust. The district court relied on neither a valid power of attorney nor the creation of an oral trust to reach its decision. We find no reason to explore issues that are not relevant to

the critical question underlying this litigation, whether Roxie created a valid transfer-on-death interest for the benefit of Maureen.

CONCLUSION

Maureen demonstrated, by a preponderance of evidence satisfying the test for being clear and convincing, that she signed the transfer-on-death deed at Roxie's direction and as Roxie's amanuensis. Additional words written by her and the acknowledging notary were surplusage. Kansas statutes and common law allow such deeds to be signed by an amanuensis. Maureen presented clear and convincing evidence rebutting a presumption that she exercised undue influence over Roxie, and Harvey failed to sustain his burden of proving a lack of testamentary capacity.

The judgment of the district court is affirmed. The judgment of the Court of Appeals affirming the district court is affirmed.

BEIER, J., not participating.
PATRICK H. THOMPSON, district judge, assigned.[1]

* * *

STEGALL, J., concurring: I concur in the judgment reached today because our common law permitting the execution of a transfer-on-death deed via an amanuensis

---

[1]**REPORTER'S NOTE:** District Judge Thompson was appointed to hear case No. 115,628 vice Justice Beier under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.

24

applies to this case and the findings of the lower court are supported by sufficient evidence. I agree fully with, and join, the conclusion paragraph of today's decision. But I cannot join the opinion entirely because, in dicta, the majority confuses and conflates the role of an amanuensis with the role of an agent.

Specifically, the majority reasons that "K.S.A. 58-2209 states that '[*a*]*ll deeds* . . . shall be subscribed by the party granting the same, *or by the party's lawful agent or attorney* . . . .' (Emphases added.) The phrase 'all deeds' certainly includes transfer-on-death deeds . . . ." Slip op. at 10. Thus, according to the majority, the Legislature has "expressed a clear intention that transfer-on-death deeds may be signed by parties who are not the actual property owners." Slip op. at 10. This, despite the language of the more specific statute governing transfer-on-death deeds requiring a signature "by the record owner" of the property. K.S.A. 59-3501(a).

This portion of the majority's discussion suggests a transfer-on-death deed may be effectually signed by an owner's agent. I disagree. Such an outcome directly contradicts the very specific legislative requirements for transfer-on-death deeds. The reason an amanuensis may be used to effectuate a transfer-on-death deed is because in the eyes of the law, such a signature *is the signature of the owner*. Not so the signature of an agent—a person with the discretionary legal authority to bind his or her principal. An amanuensis is not an agent but rather a mere mechanical extension of the individual signing the document—akin to an autopen, signature stamp, or other mechanical device. Indeed, the majority opinion states as much in our syllabus when we hold that: "An amanuensis is not, strictly speaking, an agent but acts as an extension of the principal." Slip op. at 1, Syl. ¶ 2.

25

Because I question both the legal correctness of this portion of today's decision as well as its potential effect on future cases, given it is dicta and not strictly necessary to our holding, I can only join the court's actual holdings and judgment set forth above.

* * *

JOHNSON, J., dissenting: I dissent. I view this case as a prime example of what happens when an appellate court starts with a desired result and then works backward to find a legal justification for the targeted disposition. I will refer to that reverse process as justification analysis.

Here, the targeted disposition is to have the homeplace farm of Roxie A. Moore (Owner) remain in the possession of her grandsons, Bart and Ryan Moore, to the exclusion of Owner's son, Harvey Moore. While that result might be emotionally satisfying and may even be what Owner wanted to happen, it was not effected with the requisite formality; nor was it certain to occur based on the instrument the Owner utilized. To keep that result, the majority's justification analysis employs internally inconsistent and contradictory reasoning, ignores our well-established rules for construing written instruments and statutes, renders a properly drawn and executed durable power of attorney superfluous, dilutes if not destroys the evidentiary value of a notarial acknowledgment, ignores the parol evidence rule, emasculates the underlying antifraud reason for the statute of frauds, and provides a playbook for those who would take advantage of elderly landowners. Cf. *Estate of Stephens*, 28 Cal. 4th 665, 681, 122 Cal. Rptr. 2d 358, 49 P.3d 1093 (2002) (Kennard, J., dissenting) ("Any swindler who signs an aging and infirm relative's name to a deed without the relative's permission can easily defeat the presumption of invalidity by falsely testifying that the relative asked the swindler to sign as an amanuensis.").

I suspect that many readers, especially those attorneys whose practice involves estate planning and real estate transactions, will immediately recognize the mischief that will be facilitated by the majority's abandonment of the formalities that previously assured the integrity of property and testamentary transfers. The only benefit I can perceive in that ploy is to reduce the number of malpractice claims against attorneys who fail to follow the heretofore well-established legal formalities. Further, the majority's justification analysis will be a hard pill to swallow when, down the road, a person exhibiting Harvey's character traits is in Maureen's shoes. Nevertheless, the remainder of this dissent will not focus on the generalities of the amanuensis theory. Instead, I will address the very specific question in this case, i.e., whether Owner created a valid transfer-on-death (TOD) deed in conformity with K.S.A. 59-3501 et seq.

When we are not straining to create a justification analysis, we normally begin an analysis of a written instrument by looking at the language employed within its four corners. Cf. *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1206, 308 P.3d 1238 (2013) ("[a] contract must be construed within its four corners"). Then, we consider any statutory provisions that are applicable to such an instrument or the underlying transaction. In contrast, the majority begins by discussing the history of the arcane notion of an amanuensis, which it curiously refers to as the 150-year-old common law of Kansas, entitled to the benefit of the principle of stare decisis. In actual fact, neither that term nor the principle it represents was heretofore known to most, if not all, of the seasoned jurists on this, the highest court in Kansas. Personally, after practicing in the areas of estate planning and probate for 21 years and then participating in approximately 1,500 cases on the Court of Appeals and close to 2,000 Supreme Court cases over my 18 years on the appellate courts, I had never encountered the amanuensis "common law of Kansas" in any context in any case. Pointedly, the most recent Kansas case cited by the majority was filed some 93 years ago, way before any member of this court was born; nearly three-quarters of a century before the Kansas Legislature

27

authorized a TOD deed; and more than three-quarters of a century before the Kansas Legislature enacted the current statutory scheme regarding powers of attorney, the Kansas Power of Attorney Act, K.S.A. 58-650 et seq. See L. 1997, ch. 176, § 1 (Transfer-on-Death Act); L. 2003, ch. 58, § 1 (Power of Attorney Act).

So, returning to our normal process of reviewing written instruments, one first notes that even a cursory glance at the instrument before us reveals its intended purpose and the underlying statutory authority for its creation in plain and unambiguous language. The heading says: "TRANSFER-ON-DEATH DEED." The body of the instrument states: "Roxie A. Moore, a single person, . . . as owner, transfers on death to Maureen E. Miles as grantee beneficiary . . . ." In the middle of the document, the following clarification appears in all capital letters: "THIS TRANSFER-ON-DEATH DEED IS REVOCABLE. IT DOES NOT TRANSFER ANY OWNERSHIP UNTIL THE DEATH OF THE OWNER. IT REVOKES ALL PRIOR BENEFICIARY DESIGNATION BY THIS OWNER FOR THIS INTEREST." Then, to further clarify what is being created, the instrument plainly states: "This TOD is made pursuant to K.S.A. 59-3501 *et seq.*"

By its explicit terms, then, the instrument we are reviewing is governed by Article 35 of Chapter 59 of the Kansas statutes, which is labeled "Transfer-on-Death." The first seven enumerated statutes—K.S.A. 59-3501 through 59-3507—deal with real estate. Cf. K.S.A. 59-3508 (providing that a motor vehicle may be titled in TOD form). The first subsection, K.S.A. 59-3501(a), tells us how an interest in real estate can be titled in TOD form, to-wit:

"An interest in real estate may be titled in transfer-on-death, TOD, form by recording a deed *signed by the record owner of such interest*, designating a grantee beneficiary or beneficiaries of the interest. Such deed shall transfer ownership of such interest upon the death of the owner. A transfer-on-death deed need not be supported by consideration." (Emphasis added.)

28

Ordinarily, our first step would be to look at the statute's language and give effect to the legislative intent manifested by the ordinary meaning of those words. See *State v. Barlow*, 303 Kan. 804, 813, 368 P.3d 331 (2016) (appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings). When a statute is plain and unambiguous, we should not speculate about the legislative intent behind that clear language and we should refrain from reading something into the statute that is not readily found in its words. 303 Kan. at 813. In other words, if the statute's words plainly tell us the answer to the question presented, our job is done. There is no need to seek harmony with other statutes, especially those contained in another chapter of the Kansas Statutes Annotated.

So, what do the words of K.S.A. 59-3501(a) tell us? To title an interest in real estate in TOD form requires the recording of a deed that is "signed by the record owner of such interest." I submit that the common meaning of "signed by" means that the person takes a pen in hand and applies his or her signature to the document; it does not ordinarily mean that a person tells his or her secretary to sign the deed. See Black's Law Dictionary 99 (11th ed. 2019) ("amanuensis" defined as: "1. Someone who takes dictation; a scribe or secretary. 2. An assistant, esp. one with scribal responsibilities. 3. A protégé. See protégé [1]."). The statute does not state that the signing can be accomplished by a lawful agent or attorney of the record owner or that the record owner may direct another to sign on his or her behalf. Cf. K.S.A. 58-2209 (specifically permitting a deed to be signed by a lawful agent or attorney); K.S.A. 59-606 (specifically permitting a will to be signed by someone at the direction of and in the presence of the person making the will).

In turn, "record owner" would be the person who is shown to be the owner of the real estate in the applicable records, e.g., the records of the Cowley County Register of Deeds. Here, no one disputes that Roxie A. Moore was the record owner of the real estate

29

in question when the TOD deed was executed and no one disputes that Roxie A. Moore did not sign that deed. By the plain language of K.S.A. 59-3501(a), Roxie A. Moore did not do what was statutorily required to title her real estate in TOD form.

The majority points to the respondents' argument that a failure to embrace its amanuensis theory would mean that a person who is illiterate or physically incapable of signing his or her name would be deprived of the ability to convey property. As the majority points out, pursuant to K.S.A. 2018 Supp. 58-654(f), a durable power of attorney can authorize the attorney-in-fact to convey the principal's property in any manner the principal directs, including designating beneficiaries upon the principal's death. Slip op. at 10. But the current Kansas Power of Attorney Act specifically describes a method for a person physically unable to sign to put a durable power of attorney into effect, to-wit:

> "(3) the power of attorney is signed by the principal, and dated and acknowledged in the manner prescribed by K.S.A. 53-501 et seq., and amendments thereto. If the principal is physically unable to sign the power of attorney but otherwise competent and conscious, the power of attorney may be signed by an adult designee of the principal in the presence of the principal and at the specific direction of the principal expressed in the presence of a notary public. The designee shall sign the principal's name to the power of attorney in the presence of a notary public, following which the document shall be acknowledged in the manner prescribed by K.S.A. 53-501 et seq., and amendments thereto, to the same extent and effect as if physically signed by the principal." K.S.A. 2018 Supp. 58-652(a)(3).

This provision is another example of the Legislature knowing how to convey its intent to allow the signature of another to suffice, and it certainly suggests that the Legislature does not intend that a secretary taking dictation can do the same thing as a lawfully appointed attorney-in-fact.

30

The majority declares that it is construing K.S.A. 59-3501(a) in the same manner as K.S.A. 58-2209, which provides in relevant part that "[a]ll deeds . . . shall be subscribed by the party granting the same, or by the party's lawful agent or attorney." The justification argument is that K.S.A. 58-2209 is to apply to *all deeds*, which would include a TOD deed. I concede that we have said that the existence of a separate statute that conflicts with the plain language of the statute being interpreted can create an ambiguity that would trigger the application of our rules of statutory construction. See *State v. Coman*, 294 Kan. 84, 93, 273 P.3d 701 (2012) (ambiguity can arise because various statutes are in conflict requiring the application of canons of statutory construction and consultation of legislative history). But I do not understand how the "lawful agent or attorney" language creates a conflict in this circumstance.

The majority states that it is not considering whether the grantee beneficiary signed the TOD deed form as Owner's attorney-in-fact, notwithstanding the notation on the face of the deed to that effect. Therefore, if the designated beneficiary was not Owner's attorney, the majority must believe that she was the Owner's "lawful agent" under the construction of K.S.A. 58-2209. But the majority concedes that "[a]n amanuensis is not, strictly speaking, an agent." Slip op. at 12. Of course, when the Legislature speaks, it normally is "strictly speaking," i.e., what it says is what it means.

Moreover, we have a vast body of law governing agency relationships, so much so that I took a two-hour course on the topic in law school. Yet, I am aware of nothing in that body of law that would lead one to believe that a secretary performing the ministerial act of taking dictation attains the legal status of agent of the dictator. Nevertheless, the majority divines that the duties of an amanuensis parallel those of an agent without explaining the source for that suspect declaration or acknowledging the contradiction of saying a *ministerial act* gives rise to the legal duties of an agent. But if one accepts the

31

more persuasive "strictly speaking" premise—that an amanuensis is not an agent—then K.S.A. 58-2209 provides no support for the majority's statutory construction.

But even assuming a conflict exists between or among statutory provisions, the majority fails to apply our canons of statutory construction. Most conspicuously, the majority ignores our longstanding construction rule that favors specific statutes over general statutes. If K.S.A. 58-2209 is germane because it applies to all deeds, it would be a statute of general application. The provisions of K.S.A. 59-3501, then, would be specific to a TOD deed. Our caselaw has been quite clear on the relationship between general and specific statutes:  a specific statute controls over a general statute, a more specific statute controls when two statutes are in conflict, and a specific provision within a statute controls over a more general provision within that statute. *State ex rel. Schmidt v. Governor Kelly*, 309 Kan. 887, 898, 441 P.3d 67 (2019); *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 922, 349 P.3d 469 (2015); *Matson v. Kansas Dept. of Corrections*, 301 Kan. 654, 657-58, 346 P.3d 327 (2015); *In re Tax Exemption Application of Mental Health Ass'n of the Heartland*, 289 Kan. 1209, 1215, 221 P.3d 580 (2009); *State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./Kansas City*, 264 Kan. 293, 311, 955 P.2d 1136 (1998); *Board of Park Commissioners v. Board of County Commissioners*, 206 Kan. 438, 443, 480 P.2d 81 (1971) ("Our cases are legion that general and special statutes should be read together and harmonized where possible, but to the extent of repugnancy between them the special statute will prevail over the general unless it appears the legislature intended to make the general act controlling."); *State, ex rel., v. Lewis*, 138 Kan. 725, 727, 27 P.2d 250 (1933) ("The rule of interpretation usually applied to statutes enacted at the same time is that specific provisions prevail over merely general provisions."). I would not turn our general/specific construction rule on its head by trumping the specific provisions of K.S.A. 59-3501 with the general provisions of K.S.A. 58-2209.

Moreover, the history of K.S.A. 58-2209 indicates that it originated in 1868 and was last amended in 1984. In contrast, a TOD deed did not even exist in this State as a valid conveyance document until the Transfer-on-Death Act, K.S.A. 59-3501 et seq., became effective July 1, 1997. Another canon of statutory construction permits us to presume that the Legislature knew about the 129-year-old provisions in K.S.A. 58-2209 when it enacted K.S.A. 59-3501(a) stating that a TOD deed is to be signed by the record owner. See *State v. Henning*, 289 Kan. 136, 144-45, 209 P.3d 711 (2009) (courts generally presume the Legislature acts with full knowledge of existing law).

Because the Legislature is presumed to know that K.S.A. 58-2209 specifically stated that deeds could be subscribed by the grantor's "lawful agent or attorney" we can say that the Legislature has demonstrated how to allow for that representative signing. That leads us to the construction canon that, when the Legislature has shown it knows how to provide for specific features in a statute, we assume the omission of such features in another statute was intentional. See *State v. Nambo*, 295 Kan. 1, 4-5, 281 P.3d 525 (2012) (assuming statute utilizing active voice and specifying an individual actor meant another statute omitting these features was intentional); *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, 974, 218 P.3d 400 (2009) (reasoning when Legislature has demonstrated through statutory language that it knows how to preempt the Kansas Corporation Commission, its failure to preempt the agency in another statute's text strongly suggests it did not so intend); *Halley v. Barnabe*, 271 Kan. 652, 661, 24 P.3d 140 (2001) (pointing to Legislature's inclusion of savings clause in the Kansas Revised Uniform Partnership Act to show that the absence of such clause in the Kansas Revised Limited Liability Company Act meant the latter was retroactive because "[h]ad the legislature intended the same result . . . it is clear that it knew how to do so"). We should presume, then, that the Legislature did not intend for a TOD deed to be signed by a lawful agent or attorney, much less by a secretary.

Similarly, when the Legislature revises an existing law, we presume that it intended to change the law. See *State v. Snellings*, 294 Kan. 149, 157, 273 P.3d 739 (2012). In other words, we presume the Legislature intended to omit the lawful agent or attorney language in the later-enacted K.S.A. 59-3501(a). Likewise, even if we presume the Legislature knew of the century-old caselaw on amanuensis, we should also presume that its use of "lawful agent or attorney" in K.S.A. 58-2209 and its adoption of a power of attorney act were meant to change the amanuensis law. Moreover, the inclusion of agent and attorney in K.S.A. 58-2209 implies a legislative intent to exclude an amanuensis pursuant to the canon known as *expressio unius est exclusio alterius*. See *State v. Martin*, 285 Kan. 735, 741-42, 175 P.3d 832 (2008) (inclusion of one thing implies the exclusion of another).

Perhaps most importantly, however, I submit that the Legislature intended to treat a TOD deed differently than other deeds because it is a very different mechanism and serves a very different purpose than an ordinary deed of conveyance. The first clue to that separate intent is that the Transfer-on-Death Act is placed in Chapter 59 of the Kansas Statutes Annotated, which is the probate code. See K.S.A. 59-101 ("This act is named and may be cited as the Kansas probate code."). In contrast, property provisions are located in Chapter 58. Placement in the probate code makes sense when one looks at the legislative history of House Bill 2055, which became K.S.A. 59-3501 through K.S.A. 59-3507.

The February 4, 1997 written testimony of John F. Kuether, Professor of Law, Washburn Law School, who was testifying on behalf of the Kansas Judicial Council in favor of the new legislation, explained the purpose of creating the TOD deed form, to-wit:

"There continues to be a great deal of public demand for means to transfer property to a designated beneficiary on death without the necessity of going through probate. At the same time, people want to retain the freedom to use the property as they wish, and they do not desire the named beneficiary to have any rights in the property before they die.

"House Bill 2055 is designed to permit this while allowing the owner free use of the property during life, protecting creditors of the owner and protecting people relying on the recorded title. The Council took care to protect the rights of good faith purchasers from the owner or the beneficiary after the owner's death. It also sought to prevent the need for litigation by laying out clear guidelines the public can understand. Kansas has permitted pay on death (POD) bank accounts since 1979 with no appellate litigation on their validity and very little litigation on the way they operate in conjunction with other statutes." Hearing on H.B. 2055 Before the Kansas House Judiciary Committee (Feb. 4, 1997) (testimony of Prof. John Kuether).

The testimony went on to explain that the legislation was designed to allow an owner to "register the property in TOD form without the consent of the beneficiary, just as the consent of a will, trust or POD beneficiary is not required." Kuether, testimony on H.B. 2055. Professor Kuether further explained that the standard TOD form language "makes it clear that the deed is revocable at any time by the owner"; that "[t]he beneficiary acquires no rights in the property until the death of the owner"; and that "each new [TOD] deed [that is] recorded by the owner replaces any former deed," thereby simplifying the determination of the beneficiary upon the owner's death. Kuether, testimony on H.B. 2055. With respect to the owner's revocation of a beneficiary, the professor said it could be "accomplished by recording a new deed which describes the nature of the interest in the property being deeded, such as full ownership (fee simple absolute), tenancy-in-common, or mineral rights, and revoking the [TOD] interest." Kuether, testimony on H.B. 2055. Moreover, "[t]he consent of the beneficiary is not required, just as the consent of a beneficiary is not required to revoke a will or a pay on

death account." Kuether, testimony on H.B. 2055. The bill had a provision designating that the transfer is a nontestamentary disposition so that it would be "valid despite the statute of wills." Kuether, testimony on H.B. 2055.

I certainly understand the majority's pivoting to call a TOD deed "testamentary in character" when it suited the particular point it was making, even though the case it cited for that proposition predated the authorization of a TOD deed by 23 years. Slip op. at 16. A TOD deed is not a current conveyance of any right; indeed, the designated beneficiary never needs to know that he or she was named as a designated beneficiary or that he or she was subsequently removed as a beneficiary or that the owner sold or mortgaged the property in the interim. As Professor Kuether said, it is like making a will.

But we need to look to the Transfer-on-Death Act that authorizes the use of a TOD deed form. It states, quite unequivocally, that "[a] deed in transfer-on-death form shall not be considered a testamentary disposition." K.S.A. 59-3507. I would like to see the majority reconcile that inconsistency. I am unclear how an instrument that is legislatively designated as nontestamentary can be considered a testamentary disposition when considering the mental capacity needed to make it or the burden of proof necessary to establish its validity.

Nevertheless, if we consider a TOD deed to be testamentary in nature, we are back to the notion that, where the Legislature has demonstrated that it knows how to provide for something, its omission elsewhere is significant. K.S.A. 59-606, cited by the majority, says that a will "shall be in writing, and signed at the end by the party making the will, *or by some other person in the presence and by the express direction of the testator*." (Emphasis added.) It sounds like the Legislature specifically authorized an amanuensis to execute a last will and testament without using the term. In stark contrast, the Legislature did not include that amanuensis language in K.S.A. 59-3501, the TOD authorization

36

statute. Perhaps the reason for the difference is that a will requires two witnesses. At any rate, the majority fails to explain by what authority we can, in effect, import the will language into the TOD statute. See *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 725, 317 P.3d 70 (2014) ("[E]ven where the court believes that the legislature has omitted a vital provision in a statute that precludes the intended result, if that omitted provision cannot be found under any reasonable interpretation of the language actually used, then the remedy lies solely with the legislature."); *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs.*, 290 Kan. 446, 464-65, 228 P.3d 403 (2010) ("[A]ppellate courts cannot delete vital provisions or add vital omissions to a statue if the legislature failed to enact the change as intended under any reasonable interpretation of the language used, regardless of the legislature's intention. Only the legislature may remedy these types of error.").

Turning to the acknowledgment question, I note that the majority is particularly inventive in its declaration of heretofore unknown legal principles and construction rules. It declares that "[a] court may properly consider evidence beyond the language of deeds and official signatures in ascertaining whether deeds have been effectively executed and acknowledged." Slip op. at 14. That rule contradicts the well-established method of construing written instruments:

> "'Prior to a resort to extrinsic evidence, the instrument is to be interpreted from its "four corners." That is to say, all the language used *anywhere in the instrument* should be taken into consideration and construed in harmony with other portions of the instrument. (*Skelly Oil Co. v. Cities Service Oil Co.*, 160 Kan. 226, 231, 160 P.2d 246; *Heckard v. Park*, supra; and *Smith v. Russ*, 184 Kan. 773, 339 P.2d 286.)' *Weiner v. Wilshire Oil Co.*, 192 Kan. 490, 496, 389 P.2d 803 (1964)." (Emphasis added.) *First Nat.'l Bank of Olathe v. Clark*, 226 Kan. 619, 624, 602 P.2d 1299 (1979).

37

See also *Brown v. Lang*, 234 Kan. 610, 614-15, 675 P.2d 842 (1984) ("When the intent of the parties to a contract is clearly ascertainable by construing the document from its four corners it is not considered ambiguous; although some terms may be conflicting, extrinsic evidence is inadmissible and rules of construction applicable to ambiguous contracts do not apply."); *Brown v. Parmalee*, 130 Kan. 165, 175-76, 285 P. 563 (1930) (deed cannot be varied and changed by parol). Moreover, "[t]he parol evidence rule is one of substantive law and not merely a rule of evidence, and therefore, it must be adhered to, irrespective of whether or not proper objection is interposed at trial." *In re Estate of Smith*, 199 Kan. 89, 95, 427 P.2d 443 (1967).

The majority concedes that within the four corners of the TOD deed form, the designated beneficiary stated that she signed the document pursuant to a power of attorney and that, in the acknowledgment, the notary public handwrote a notation that indicated that the document was signed by Owner's attorney-in-fact. That is plain and unambiguous and requires no extrinsic or parol evidence. See *Holly Energy, Inc. v. Patrick*, 239 Kan. 528, 534, 722 P.2d 1073 (1986) ("[A] contract is 'ambiguous only when the words used to express the meaning and intention of the parties are insufficient in that the contract may be understood to reach two or more possible meanings."). The majority side-steps that insurmountable obstacle by declaring that the portion of the deed language that does not support its justification argument is merely surplusage. Slip op. at 14. But an interpretation "'"should not be reached merely by isolating one particular sentence or provision, but by construing and considering the *entire* instrument from its four corners."'" (Emphasis added.) *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 296 Kan. 943, 963, 298 P.3d 250 (2013). Simply put, the majority's cherry-picking of language within the four corners of the instrument and labeling it surplusage to avoid its effect on the construction of the instrument appears to be result-oriented.

The majority continues by relying on an 1891 case to declare that an acknowledging officer is a ministerial officer and, accordingly, his or her mistakes may be explained and corrected by proper proof. Slip op. at 14-15. The majority bolsters that argument by declaring that an acknowledgment is not part of a contract between parties. Slip op. at 14-15. Those arguments are simply unavailing.

First, the notary in this case did not make a mistake. The designated beneficiary specifically stated—on the face of the instrument to be acknowledged—that she was signing the deed form as power of attorney. The notary simply memorialized what the person signing the instrument had said, i.e., that the TOD deed was acknowledged by Maureen Miles as POA for Roxie A. Moore. The parol evidence presented in this case was not offered to explain and correct what the notary had done; it was offered to *change* what the designated beneficiary had done. The only mistake here was Maureen Miles' misunderstanding of the law as to her authority under the durable power of attorney.

As to the majority's declaration that an acknowledgment is not part of the contract between the parties, it is questionable whether a TOD deed is a contract or whether the designated beneficiary is a party to the transaction at the time of acknowledgment. K.S.A. 59-3501(a) specifically says that a TOD deed need not be supported by consideration, so it is at best an illusory contract. Moreover, as noted above, there is absolutely nothing conveyed when a TOD deed is executed; the designated beneficiary gets nothing until the owner's death and even that future interest is completely revocable without the beneficiary's knowledge or consent and is subject to all conveyances and encumbrances incurred prior to the owner's death. Indeed, if the owner revokes the TOD deed or conveys the property to someone else before death, the designated beneficiary need not even know that the TOD deed ever existed. So it makes no sense at all to construe an acknowledgment "as against the grantor." Slip op. at 15. The whole purpose of a TOD

deed is to benefit the grantor, allowing a post-death gift of real estate without the expense of a probate proceeding.

More generally, I discern that the majority's justification analysis is replete with a great deal of superfluous, if not completely irrelevant, facts that make its result appear to be palatable, if not legally supportable. For instance, the majority specifically points out the fact that Maureen conveyed the real estate to her sons before this litigation began, characterizing that act as "surrender[ing] her entire personal interest" in the real estate. Slip op. at 20-21. The majority declares that the reconveyance is circumstantial evidence of Owner's motivation in making the TOD deed, and it therefore constitutes clear and convincing evidence to rebut the presumption of invalidity of the self-dealing deed. I confess to being incapable of grasping that specious and eristic argument. How can Maureen's gratuitous deeding of the real estate to her sons three years after Owner's death (that triggered ownership in the beneficiary) and some eight years after Owner executed the TOD deed be circumstantial evidence of anything that is relevant to the validity of the TOD deed? Cf. *In re Estate of Wood*, 218 Kan. 630, 633, 545 P.2d 307 (1976) ("In admitting parol evidence the inquiry should be confined to the facts and circumstances existing prior to and contemporaneously with the execution of the contracts, since it is only the intention of the depositor at the time of the creation of the account that is material.").

Finally, I want to comment on the relationship between the TOD deed we are supposed to be reviewing and Owner's stated intent that she wanted her grandsons, Bart and Ryan, to have the land. As the majority acknowledges, "Attorney David Andreas drafted a transfer-on-death deed assigning the property rights to *Maureen* upon Roxie's death." (Emphasis added.) Slip op. at 20. Simply stated, the deed we are reviewing lists Maureen E. Miles as grantee beneficiary. Neither Bart nor Ryan is mentioned anywhere in the deed; for example, the grantee of the deed *could* have been Roxie A. Moore and

40

Maureen E. Miles, as joint tenants with right of survivorship, transfer on death to Bart Moore and Ryan Moore as tenants in common. See K.S.A. 59-3505 (addressing the use of TOD designation by joint owners). But the way the deed was structured, Owner had to hope that Maureen would give the land to Bart and Ryan, which she was in no way legally obligated to do. More importantly, Owner had to hope that Maureen would not die before gratuitously transferring the property to Bart and Ryan.

If Maureen had died during the five-year period between execution of the TOD deed and Owner's death, the TOD designation would have lapsed, there would have been no transfer of the land to Maureen, and, consequently, no reconveyance to Bart and Ryan. See K.S.A. 59-3504(c) (transfer lapses if grantee beneficiary dies before record owner). If the land had then passed by intestacy, Harvey would have gotten it. See K.S.A. 59-506 (if decedent leaves child and no spouse, all property passes to surviving child). If Maureen had died after Owner, but before she deeded the property to her sons, her current husband would have been entitled to receive one-half of the real estate, i.e., Bart and Ryan would not have gotten all of the land. See K.S.A. 59-505 (surviving spouse entitled to one-half of all real estate of which the decedent at any time during the marriage was seized or possessed). The point is that the TOD deed, even if valid, would not have ensured that Bart and Ryan would have received the land. Therefore, using the Owner's intent to leave her land to her grandsons as a justification for bending, if not breaking, our rules of construction strikes me as disingenuous.

In short, I would reverse the Court of Appeals and the district court and hold that the TOD deed was invalidly executed in derogation of the express authority of the durable power of attorney.